**RADIO CORPORATION OF AMERICA**

v.

**ASSOCIATION OF PROFESSIONAL ENGINEERING PERSONNEL;** Association of Professional Engineering Personnel Camden Area Chapter; (and Charles M. Brindley,) Appellants.

No. 13455.

United States Court of Appeals Third Circuit.

Argued April 6, 1961.

Decided May 25, 1961.

Arthur S. Keyser, Philadelphia, Pa. (Kleinbard, Bell & Brecker, Philadelphia, Pa., on the brief), for appellants.

Bernard G. Segal, Philadelphia, Pa. (Samuel D. Slade, and Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., on the brief), for appellee.

Before GOODRICH, McLAUGHLIN and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

For some fifteen years the terms and conditions of employment of engineering personnel at Radio Corporation of America, hereinafter called RCA, have been the subject of a series of labor contracts between RCA and Association of Professional Engineering Personnel, a labor union. The present controversy arises under a labor contract between these parties which was effective throughout 1957 and until July 1, 1958.

The contract in question, like its predecessors, outlined a procedure for granting periodic "merit increases" to engineering personnel. In April 1958, the union, dissatisfied with the employer's administration of the merit increase system, filed a written grievance complaining that RCA had violated the contract by improperly lowering the average level of merit increases and by considering improper factors in determining their amount. RCA replied that the amount of merit increases was neither grievable nor arbitrable under the contract and that, in any event, the grievance was not timely. The union then submitted the matter to the American Arbitration Association and, over the employer's objection, that organization instituted arbitration proceedings.

RCA countered by filing the present complaint in the United States District Court for the District of New Jersey seeking under Section 301 of the Labor Management Relations Act, 29 U.S.C.A. § 185, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, an authoritative adjudication that the union's stated grievance is not arbitrable. The union then filed a counterclaim asking that RCA be ordered to arbitrate the grievance. After full hearing, the court entered final judgment in favor of the employer permanently restraining the union from taking its grievance to arbitration and dismissing the union's counterclaim.

■ Because of the wording of Section 301 of the Labor Management Relations Act, it is necessary to resolve a preliminary question of jurisdiction. That section creates federal jurisdiction over "suits for violation of contracts between an employer and a labor organization * * *." In its counterclaim the union asserts that the refusal of RCA to arbitrate a certain grievance constitutes a breach of their collective bargaining agreement. This is the type of "violation" which Section 301 most obviously covers. Indeed, it is now established that such a proceeding to compel arbitration, alleged to be required by a labor contract, presents a cause of action which is created by as well as federally cognizable under Section 301. Textile Workers Un-

ion of America v. Lincoln Mills, 1957, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972.

▇▇▇ It is less clear that the employer's complaint against the union, seeking an adjudication that the stated grievance is not arbitrable under the collective bargaining agreement, is a "suit for violation of a contract" within the meaning of Section 301. However, we think that in the context of Section 301 the more reasonable reading of "suits for violation of contracts" includes a proceeding by a party who seeks to determine by declaratory judgment whether his own conduct in refusing to arbitrate is a violation of a labor contract. This court and at least one other have assumed as much in cases where the issue of jurisdiction was present but was not raised by the parties. International Tel. & Tel. Corp. v. Local 400, 3 Cir., 1960, 286 F.2d 329; Boston Mutual Life Ins. Co. v. Insurance Agents Int'l Union, 1 Cir., 1958, 258 F.2d 516. One district court has squarely so held, stating the argument for its position persuasively:

"But 301 should not be read literally and with stress on the word 'violation'. Congressman Hartley, who was the co-author and sponsor of the Labor Management Relations Act, 29 U.S.C.A. § 141 et seq., in responding to an interpellation by Congressman Barden, construed the language which became § 301 as contemplating not only ordinary lawsuits for damages and equitable relief, but also 'proceedings * * * brought by employers, the labor organizations, or interested individual employees under the Declaratory Judgments Act in order to secure declarations from the Court of legal rights under the contract.' 93 Cong. Rec. 3656–3657. This enlargement of the letter of § 301 has gained the apparent approval of the Supreme Court and has been used as an essential link in its chain of reasoning in Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 455–456, 77 S.Ct. 912, 1 L.Ed.2d 972.

See also 353 U.S. at page 521, 77 S.Ct. at page 952. This enlargement corresponds with the general policy which Congress adopted in the Labor Management Relations Act,—a policy of strengthening labor contracts by using the federal courts to award damages for breaches of those contracts."

New Bedford Defense Products Division of Firestone Fire & Rubber Co. v. Local 1113, D.C.D.Mass.1958, 160 F.Supp. 103, 109, affirmed 1 Cir., 258 F.2d 522; accord Armstrong-Norwalk Rubber Corp. v. Local 283, D.C.D.Conn.1958, 167 F. Supp. 817. But cf. Mengel Co. v. Nashville Paper Products and Specialty Workers Union, 6 Cir., 1955, 221 F.2d 644.

We conclude that both the employer's present claim and the union's counterclaim arise under Section 301 of the Labor Management Relations Act and also that the claim is cognizable under the Declaratory Judgment Act.

We come now to the merits of the demand for arbitration which must be determined in the light of the provisions of the controlling labor contract. That contract defines "grievances" as meaning "disputes or differences * * * with respect to the interpretation or application of any provision of this Agreement". It then spells out in detail the procedures to be followed in the presentation and disposition of "grievances". The first step embraces the formal submission of a grievance by the union to the employer and the ensuing efforts of the parties to adjust the matter between themselves. If this fails, the second prescribed step is arbitration pursuant to a written demand by either party. In providing for arbitration the contract stipulates that the "authority of the Arbitrator shall be limited to determining questions involving the interpretation or application of the terms of this Agreement or the applicable Area Agreement. He shall have no authority to add to, subtract from, or to change any of the terms of this Agreement or any Area Agreement, to change an existing wage rate, or to establish a new wage rate".

The present dispute concerns merit increases. This subject is covered by the following provisions of the contract:

"*Paragraph 5.07* Merit Increases: The performance of employees shall be reviewed for merit increases. The merit increase eligibility dates of employees shall be determined in accordance with the following schedule:

\* \* \* \* \* \*

[the schedule which appears at this point provides intervals of 8 to 13 months between merit increase eligibility dates according to occupational categories.]

\* \* \* \* \* \*

"Each employee shall be informed on the designated increase eligibility date of his status of eligibility for a merit increase, and shall at that time receive a dated written notice signed by the Company, that there has been compliance with this provision. The employee shall sign two copies of the notice, retaining one copy and returning the other copy to the Company.

"If an employee is advised that he is eligible for a merit increase, such increase shall become effective on the designated increase eligibility date. His next increase eligibility date will be in accordance with the provisions of this paragraph 5.07.

"If an employee is advised that he is not eligible for an increase his next increase eligibility date will be three months from his last merit increase eligibility date.

"Any disagreement by the Association with the decision of management as to the employee's eligibility for a merit increase under this paragraph is subject to the grievance procedure. Nothing in this Agreement shall prevent the Company from making such individual interim increase as in its judgment individual effort and efficiency may warrant."

We next quote the union's statement of the grievance it seeks to arbitrate in this case to show its relation to the merit increase provisions of the contract. The union's formal statement of grievance as submitted to the employer in April, 1958 reads as follows:

"Under the Agreement, the Company is obligated to review, periodically, the performance of employees for the purpose of determining whether the particular employee is entitled to a merit increase. Under the Agreement and by established practice, the Company has become obligated to grant a level of increases which, for the group as a whole, is consistent with the level granted in prior years and has also become obligated to base the level of increase for any individual employee upon his level of performance. The Company has now violated the Agreement and these established practices by reducing the general level of merit increases and by basing individual increases upon factors other than the level of performance."

In this context we must decide whether the present dispute involves "the interpretation or application of the terms of" the contract, as that phrase is used in the agreement of the parties defining the types of disputes which should be arbitrable.

We think the union's contention amounts to this. Over the years during which each successive contract covering engineering employees has provided for "merit increases", that phrase has come to have a particular meaning understood and accepted by both contracting parties. According to the union, the phrase "merit increases" connotes a minimum average level of periodic increases determined on the basis of the amounts of increases in past years. It also requires that the amount of each increase be determined solely upon the quality of the performance of the individual employee. This interpretation of the contract, which limits the discretion of the employer in de-

termining the average level and amount of merit increases, is vigorously disputed by RCA. The opinion of the court below also seems to reflect the view that the union's interpretation of the contract is erroneous. We express no opinion on that point.

■ The Supreme Court has very recently made it clear that it is not a court's function in such a situation as this to judge the merits of a grievance which presents a dispute as to the meaning of a provision of a labor contract. So long as the complaining party bases its grievance on an alleged failure to perform an obligation of a contract, a standard arbitration clause making disputes "involving the interpretation or application of any provision" of the contract arbitrable should be enforced by a judgment requiring arbitration. United Steel Workers of America v. American Mfg. Co., 1960, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed. 2d 1403. In that case the court stated that "the function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator." 363 U.S. at pages 567–568, 80 S.Ct. at page 1346. Accordingly, if there were nothing relevant in the labor contract except the language already discussed, the present dispute would unquestionably be arbitrable.

It remains to consider one express and one allegedly implied exception to the otherwise comprehensive agreement to arbitrate disputes involving the interpretation of any provision of the contract. The express exception appears in the sentence of the contract immediately following the general provision for arbitration of disputes concerning the interpretation of the instrument. It reads that the arbitrator "shall have no authority * * * to change an existing wage rate, or to establish a new wage rate". The employer reasons that if an arbitrator should disturb the amount of a merit increase which the employer has granted, the arbitrator would "change an existing wage rate" and "establish a new wage rate". But if the union is correct in its interpretation of the merit increase provisions—and we do not imply that it is—then the minimum average level of periodic merit increases and the relevant criteria for their determination, as well as the time when they are due, have already been fixed by agreement of the parties. The arbitrator's ruling on this dispute as to the amount of merit increases would thus merely enforce a contractual scheme of escalation. Certainly, if a contract provided for a wage increase of 5% at the end of a year and the employer granted only a 4% increase at that time, an award of the difference could not be characterized as action changing an existing wage rate or establishing a new one. This would be true of the present case also, if, as assumed above, the arbitrator should conclude that the merit increases granted by RCA were less than an agreed minimum or had been calculated in disregard of agreed criteria.

Finally, and as a separate point, RCA finds an implied limitation upon the arbitrability of grievances concerning merit increases in that sentence of the merit increase section of the contract which provides that "any disagreement by the Association with the decision of management as to the employee's eligibility for a merit increase under this paragraph is subject to the grievance procedure". From this specific provision making individual "eligibility" for a merit increase arbitrable, RCA draws the negative inference that no other aspect of the administration of the merit increase plan is arbitrable. However, this provision may well have been included in the contract because it was arguable that such a dispute did not depend upon any "interpretation or application" of the agreement, but rather upon judgment as to the quality of an individual's work. This would have made the general provision for arbitration of questions of contract interpretation and application inappli-

cable and a separate provision would have been needed to make this kind of controversy arbitrable. In this view of the matter the inclusion of the special arbitration provision would not give rise to any logical implication that disputes concerning the interpretation of the merit increase section are not arbitrable under the general arbitration clause.

■■ A recent ruling of the Supreme Court is helpful in our disposition of this effort to limit the agreed area of arbitration. In United Steel Workers of America v. Warrior & Gulf Navigation Co., 1960, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed. 2d 1409, the collective bargaining agreement contained both a general agreement for arbitration of disputes as to the meaning and application of the contract and an express exemption of "matters which are strictly a function of management". The dispute in controversy concerned the contracting out of certain repair work and the consequent layoff of some employees. In holding that the grievance was arbitrable the Court said that "in the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where, as here, the exclusion clause is vague and the arbitration clause quite broad". 363 U.S. at pages 584–585, 80 S.Ct. at page 1354. Earlier in the opinion the Court had ruled that an "order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage". 363 U.S. at pages 582–583, 80 S.Ct. at page 1353. This approach is decisive here where the general arbitration clause is comprehensive and the alleged exclusion is derived by doubtful implication from an additional provision of the contract for arbitration in a special case. Certainly the implied exclusion is not clear. We must resolve the substantial doubt which exists in favor of coverage.

We conclude, therefore, that the present grievance is a dispute concerning the interpretation of a labor contract and is covered by the contractual undertaking of the parties to arbitrate such disputes. We repeat that neither this holding nor anything said in this opinion is intended to prejudge in any way the merits of the dispute which the arbitrator will be asked to decide.

■ The one other point requiring comment is the contention of RCA that under the provisions of the contract, the present grievance is not timely. This court has ruled very recently that such a question is itself a matter of contract interpretation for decision by the arbitrator. International Tel. & Tel. Corp. v. Local 400, supra. We adhere to that position.

The judgment will be reversed and the cause remanded for the entry of judgment denying relief on the complaint and granting relief on the counterclaim.